Our next case for today is 2018-1065, IBM v. Iancu. Mr. is it Osayef? Osayef, Your Honor. Osayef. Mr. Osayef, please proceed. May it please the Court, Karim Osayef for IBM. Your Honor, I'd like to focus on two reasons for reversal here today. First, with respect to the SONATA decision, the Board misconstrued the term federated computing environment and that warrants reversal. And second, with respect to Melmer, the Board relied on a lack of evidence rather than substantial evidence and that too warrants reversal. With respect to SONATA, this presents a somewhat unique situation in which the petitioner below Priceline, IBM, and both experts all agreed on a definition of federated computing environment. All of them agreed that it must require two enterprises, citing a specific passage from the specification. Yet despite that evidence where everyone agreed, the Board in its final written decision construed federated computing environment to be much more broad and to encompass any two computers even if they're within the same enterprise. You're not suggesting that the Board is bound on the legal question of claim construction to the positions being argued by the parties, are you? We certainly aren't. That's correct. The Board is not bound by what the parties proposed. However, our argument is first of all, the construction's wrong. And second of all, it's a violation of IBM's due process rights to not even have noticed beforehand that claim construction could possibly be at issue. I'm not sure what it is that, what the relevance of your process argument is. We have a claim construction dispute that we can perfectly well decide. We decide you're right, the Board is right. I don't understand what additional role the You didn't get a chance to put on evidence of what SONATA shows under your claim construction. You did. You assumed your claim construction. So what is the relevance of that? Your Honor, the relevance is if IBM could not have predicted that the construction would be significantly broader. It's similar to the case of SAS where the, because the argument was not at issue, IBM did not think about what types of arguments would have to be made in the alternative, where a construction could not have been expected. So IBM put a lot of arguments in the basket of, under this construction that everyone agrees on, there's no anticipation. But now that the construction was changed at the last minute, without warning, then those arguments no longer have merit if the Board is correct, which we would disagree If the Board is correct, what possible arguments would you have that SONATA doesn't anticipate? If the Board is correct, then we would say that the case should be remanded so that IBM could have an opportunity to address those. I know that's your position. I'm asking what possible argument could you make? If entities is the correct construction and that a federated system can include, you know, multiple computers inside a single enterprise. I'm just asking you right now, why doesn't SONATA have that? Your Honor, one of the arguments we could make concerns conception and reduction to practice. And in fact, below, under the construction where something is, where a federated computing environment is broader, it would be easier to show conception and reduction to practice. In fact, Priceline below argued that the conception was not actually a true conception and reduction to practice because the term federated computing environment must require more than one enterprise. So because of that argument, the case could have turned out differently. And furthermore, I would argue that, you know, that is precisely the problem is that IBM would have to develop those arguments and come up with a different position. You know, we could have allocated briefing differently if we had expected a different definition of federated computing environment. In just looking at this patent specification, it's a little messy. It's a little hard to tell what's the right way to think of the claim construction here. Your Honor, there are some passages which are crystal clear, though. And I would direct Your Honor to Appendix 1119 at 27 to 8, which says that federated trust domains are those that cross enterprise boundaries. So that's clear distinguishing the particular type of federated environment as opposed to a normal environment. Yes. Then there's the other passage, right, that the board latched on to at Column 10, which talks about, you know, a federation as a set of distinct entities, such as enterprises, organizations, institutions, et cetera. And so then it makes you wonder, OK, is the term entities, which apparently encompasses a variety of things like enterprises, organizations, and institutions, is necessarily a broader term than enterprises? And then the next question is, assuming it is, how far does that go? And could it be so broad that it, in fact, encompasses subsystems within a single organization or unit or enterprise? Your Honor, there's a couple of responses to that passage. The first is when it says such as enterprises, organizations, and institutions, it's telling you the type of entities that qualify in a federated computing environment. It's not saying that all entities necessarily qualify. The second is that in that same sentence, the part that the board does not cite, it says that a federated computing environment differs from a typical single sign-on environment in that the two enterprises need not have a direct pre-established relationship. So it's telling you in the rest of that sentence that it's talking about interactions between enterprises. Those are all examples of synonyms of enterprises, organizations, institutions, et cetera. They're not two computers within the same organization, within the same enterprise. That would be much too broad. Just maybe on a network level, computer science level, is there any meaningful distinction between engineering this sign-on process between two computers that happen to be in a single enterprise versus two computers that are part of two separate enterprises? Yes, Your Honor. Those are discussed in Column 1 of the patent, which talks about how within an enterprise, it's easy to do single sign-on because everything works on the same network and it's all organized by the same people. However, when you go beyond a single enterprise, users still expect an easy single sign-on process, but it's much more difficult because you reach problems of compatibility and of trust, and that's what the patent's about. We're running out of time. Could you get to Melmer? Yes, Your Honor. Specifically with respect to Melmer, the problem is that the board relied on a lack of evidence rather than substantial evidence. The board found that even though everyone agrees that the user must participate in the process of... Are you saying that the only way that the reference could meet the limitation is if the Melmer reference said, we have an access card here, and by the way, this access card does not have credential information contained in it? No, Your Honor. That's the only way it's going to... No, Your Honor. That is not our position. Our position, however, is when IBM comes up with affirmative evidence and says, here's evidence that access cards actually do have credentials, and cites passages from Melmer telling us that it does, it has... And other scenarios you're talking about, not the no account with a partner site scenario. Correct, Your Honor. However, it's all part of the same flow, which no one disputes. It's on page 16 of our brief. It's all part of the same flow. What that means is in order to believe the other side, you'd have to imagine that access cards are suddenly something completely different halfway through the flow of what is going on. And furthermore, what Priceline says is not that they don't have credentials in that flow, but rather Melmer is silent as to what information is included in the access card or what, if any authentication process is performed. That's at appendix 5436. That is a stunning admission. It is saying we don't know what, if any, authentication is performed. So I'm not here to say that Melmer would have to say the access card here has no credentials explicitly. But what I am here to say is that if IBM comes forward with expert testimony with the evidence that access cards have credentials elsewhere in the flow, with the fact that they are called access cards, and figure 34 shows an actual sign-on box, that we need something other than a response from Priceline that simply says, it is silent about this. We don't know what authentications are happening. The burden should be on IBM. That is incorrect under in-ray Magnum oil tools. Do I understand correctly that at least on occasion, and at least in recent years, the board has been pressing a view that for negative limitations, silence is enough? I'm not sure how I would characterize the typical climate here, but I think that one way to view it is to compare in-ray Cray, which the director cites, and in-ray Magnum oil tools, which we cite, and look at the two situations. And in in-ray Cray, there was affirmative evidence of a motivation to combine, and the patentee was not able to rebut that evidence. And that was not shifting of the burden. Here, like in-ray Magnum oil tools, and indeed the types of quotes we see are just like the Magnum oil tools, there's a situation where we came forward with affirmative evidence, and the only response... Can I ask you, do you think that in an IPR context, a fairly well-established proposition, most recently relied on by this board in Southwire and then in-ray Best, that for an inherency inquiry where experiment is necessary to figure out whether some piece of prior art has some now-claimed property, and where it's old law that says if there's a sufficient prima facie case that it looks like it might have that property, then the actual burden shifts to the other side to show that it doesn't because the PTO can't do experiments and the party can. Your Honor, I do not believe this is a situation which we need to look to experiments. I think this is more analogous to dynamic drinkware, where it talks about if we come forward with the burden of production, saying here's a reason why access cards have credentials, here's expert testimony, here's analysis, the response, the burden always remains with the petitioner. I remember, and the board did not really address that evidence. It ultimately relied on the silence. In this case, the board ultimately relied on the silence idea. Specifically, the conclusion of the board's analysis was, quote, the absence of sufficient evidence showing the provision or validation of a set of credentials at the partner site, and that's Appendix 67. But is that a finding about your evidence? No, Your Honor. I think that's a finding that there's no evidence at all, and if Melmer doesn't teach us whether there's a second authentication, it can't anticipate. That is clear under cases like Wasicka Financial. So let me see if I can understand something. Are you saying that if, let's say all those other scenarios aren't in the reference, and we just have this no account with the partner site scenario, and then the passage goes on and talks about having an access card and but doesn't say anything more about the content of the access card, and would it be enough for the board and the petitioner to say, there's nothing in here about the access card containing this authentication information, and so therefore that should be enough to establish the meeting of this negative limitation? Yes, Your Honor. I think it might be a different situation if it was simply silence and that's it. But if there was affirmative evidence like in the other scenarios, like the expert testimony, indeed the fact it's called an access card and used to log into the system, i.e. another sign-in, not single sign-in, I think that's where you have issues. So if the reference is completely silent, I'm not here to say that the reference has to say affirmatively, we do not meet this limitation, we do not do an authentication. But if there's evidence on the record that says, yes, there is another authentication for multiple reasons. Okay, Mr. Ustay, if you've used all your time and almost all your rebuttal time, would you like to save any time for rebuttal? Yes, Your Honor, I'll save the remainder of my time. Okay, Ms. Lafitte, we'll hear from you now. Good afternoon, Your Honors. May it please the Court. The Board here properly found that Milner and Sonata anticipate IBM's claimed invention. With respect to the federated computing environment and the construction of that term, the specification is extremely broad. And the Board pointed to numerous places within the specification where the term entity was defined as a listing of things, like institutions, as Judge Chen pointed out, systems, organizations. There are also places in the specification where they talk about, numerous places, excuse me, in the specification where the specification talks about entities being domains and systems. And so for the Board... I guess my trouble is I couldn't find anything in the specification that led me to think that the inventors here were thinking about entities as individual subsystems within some larger organization, enterprise, institution, as opposed to thinking of entities as being an organization, institution, enterprise that is communicating with a separate organization, institution, enterprise. So that's the concern I have right now with the Board's construction of federated computing environment. And I understand that, Your Honor. It's tough because as I stated, the specification is so broad. But there is on page APPX1113, on column 8, lines 35 through 36, they talk about the terms entity or party generally refers to an organization, an individual or a system that operates on behalf of an organization, an individual or another system. This notion that it has to specifically lay out that it can be two systems within one enterprise doesn't match up with what the specification says. Is there something beside that sentence which I must say I find not clarifying? Because it doesn't say an entity is any system in the sense of a physical thing. It seems to start with the controlling unit and then says, well, we include the systems of that unit. Right. And Your Honor, again, I think that's because of the way the specification is written. But there are other places that the Board pointed to in addition to that, which was also APPX1114, column 10, lines 62 to 64, where it talks about a federation being a set of distinct entities, and then it does this, etc. But that's the such-as point, which seems to be pointing not to the physical things, but rather to the units, if one can call them that, that are the entities. Running or operating or controlling or owning the individual physical machines. I think that that might be a fair reading, but you also, the key to this invention, right, is that you have these two items, let's just say, for lack of a better word, right now, that have a trusted relationship among each other, right? That the requirement is that even if you look at the... We just don't have a problem to solve when there's a single controller. I don't mean a physical controller, I mean a human or artificial legal entity controller that can make everything work together. This patent is entirely about the situation where you don't have that. Is that not right? That's not necessarily true that you don't have something to solve because you have a single controller. If you can think about a company that has multiple products that you still need to have sign-on access to, if you had like Google and you might have to sign into Gmail, but they also have something like Pinterest and you might have to sign into that. I mean, they have ways they can create, even within themselves, they can either do it separately or they can create a way that you can sign into one through the other. For example, Facebook owns Instagram. So there may be gray area cases where, let's call them subsidiaries, might or might not be different enterprises, but two machines completely in the control of a single corporate entity? Really? Is that what this patent is about? It's about, based on the construction of the board, it is about, that the board found, it is two systems. Again, because if you look at the claim language, the claim language is very broad. It says a federated computing environment is comprised of a first system and a second system with one or more, at least one or more systems having a processor. That is what makes up the federated computing environment. And you can have a situation like that, like in Sonata, where you have an SSO server one and you have web applications, two or three, that are working together, as this board found, to create a trusted relationship such that someone can sign into those web applications and still, and not have to use their credentials if they have access to SSO server one. That is arguably, because Sonata doesn't say that it's within, explicitly state that it is two enterprises, that is a situation where those web applications and that SSO server one wouldn't necessarily have a trusted relationship, but for the fact that there's this creation of this federated computing environment. I think that looking at the specification, that's a fair way to read it, because it's all over the place. There's times when at one minute they're using entities, times where they're using enterprises, and all the board said is, you're not limited to enterprises. Enterprises is a type of entity. It's a broader way of looking at it, and that can encompass multiple readings of federated computing environment. Is there a dispute about the premise that both parties agreed that multiple enterprises were required? There's a dispute in the sense that both parties agreed that multiple enterprises are required. However, I would take issue with characterizing it as saying they had the same construction, because petitioner argued whether or not the preamble limited the claim to federated computing environment. There's no dispute about that now. The board said, treated it as limiting? The board treated it as limiting, but not to enterprises, to entities. I take a little bit of issue with this notion that they had the exact same construction. I will admit that they both said it's limited to enterprises, but you have a situation here where you have the patent owner saying, okay, this is enterprises, and you have the petitioner saying, but it's not limiting, and the board comes in the middle and says, well, it's limiting, but it's not limited to entities. So it's not exactly identical construction. I guess it was identical to the extent that both parties agreed that if the preamble was limiting, then they both had the same conception of what federated computing environment meant. Would that be fair to say? That would be fair to say. However, if you look at what the petitioner did in their petition, they say, if the preamble is limiting, we still believe that Sonata teaches that SSO server one is the first system, and web applications two or three are the second system. So it's fair to say if it's limiting, we come to this construction, but they then also, the board supported their description of how Sonata anticipated IBM's claims. There was no dispute about it being... Well, what if we were to reverse the construction there? We would have to go back, right? You're not suggesting that the board said enough that even under the narrower conception of the claim, we should go ahead and still affirm it? Absolutely. We hope that you affirm the board, but if for some reason you believe that the construction was wrong, then we would ask that it be remanded back to the board to make a finding under the construction. The petitioners are gone now, right? They are. So how would that work at the board if there's no opposing party? So there was an argument that the petitioner made with respect to Sonata being able to anticipate because it had this inherent internet... They had an inherent argument. That was not decided on here by the board. We could look at the papers. There wouldn't need to necessarily be additional briefing. That's up to the board to decide how this is carried out. I'm not suggesting that I could tell the board how to do this. Do you think that when parties settle and an IPR is pending in front of the board, the board will issue, will terminate the IPR? The board has the option to do what they choose to do. I'm not saying they wouldn't do that as well, but they could if they wanted to go back to the way and look at the papers as they've been briefed and make a decision on whether or not the construction that has been proposed by this court would fit based on that petition. And if that occurred, there would be no estoppel effect, is that right, because there would no longer be a final written decision? That's my understanding, Your Honor. What about Melmer? Okay, so with respect to Melmer, again, the board here was correct in finding that... Did the board cut off its analysis a little by just concluding that, well, the access card in this particular scenario doesn't say what it contains, and so I'm not going to consider the fact that the access card in other scenarios disclosed in Melmer do, in fact, expressly talk about having credential information contained in the access cards. I don't think it cut off its analysis, Your Honor. Well, the board didn't say anything about why this access card in this scenario should be considered unique from the other access cards in the other scenarios, and somehow in the operation of logging on to the partner site in the context of this scenario, there would be no need to have the credential information in this access card as the Melmer reference talks about using and having credential information in the access cards for the other scenarios. And the board never did a compare and contrast and explained why this particular access card would be so unique to the other access cards. So I think because it's a little bit of a mistake to conflate the different scenarios as one. I know that's what IBM is asking, but Melmer is very explicit on describing different ways in which it works depending on whether or not there's a Digital Me Aware connection with the partner site or not. In this no account on the site scenario, which is the one that's the focus of the anticipation rejection, is that there there's silence as to the access card. To go and look at another scenario and say, well, but over here it says XYZ, doesn't really make a whole lot of sense because Melmer could have put that in that particular scenario if that's what it wanted. And in fact, it isn't as if the board ignored IBM's experts. It looked at that evidence. It heard IBM out, which is partially why they're complaining that we shifted the burden. But all it was doing is saying, look, petition approved by a preponderance of the evidence that Melmer is silent as to this issue. And nothing, your experts didn't convince us otherwise. And you pointing to other scenarios within Melmer didn't convince us otherwise. And therefore, we make a finding that there's anticipation here. There wasn't burden shifting. There wasn't ignoring. There wasn't a cutting off, as you suggest. They just weren't. The petitioner proved its burden, and the board was satisfied with that because they, too, didn't see anything with this access card. Do you think silence alone is enough in a reference to meet a negative limitation? Well, I don't know that the limitation is negative. In fact, the limitation is, well. It says only one authentication. Right. Which means there's no second authentication in the sign-on process. I think silence alone should be enough because to have anticipation, you have to prove that all the elements are present. If you're trying, and we've shown we have one sign-on, and here we have no evidence of another sign-on. There's no reason to suggest that Melmer being silent as to that second authorization should mean something else, that we should infer that, oh, well, maybe there is because it doesn't say. Silence should be enough to answer that question. For purposes of this case, do you agree that if the access card in the no account on partner site scenario, if that access card does contain credential information, then that would be sufficient to be a second authentication and therefore then defeat disclosing that particular limitation, negative limitation? I just want to read the claim for one second just to answer you because I want to make sure that I'm. It felt like the debate boiled down to whether or not the access card has credential information. I just want to make sure there wasn't something particular to this claim that might. But I think the answer would be if it was shown that the access card had credentials and that the second system was relying on those credentials to allow a user access, then that would be a second authorization. And if there are no further questions, I respectfully ask that this court affirm the board's decision. And if you do disagree with the claim construction, I respectfully ask that you remand the case back to the board. Thank you. We'll restore and we'll give you two minutes for rebuttal time. I'd like to first address the question that you asked, Judge Toronto, about whether the burden shifting makes sense here. We're in a situation where the PTO is faced with an experiment or a negative limitation there. There's burden shifting. And I just wanted to provide you a more clear answer that the reason why it doesn't make sense here in the IPR context is we're in an adversarial situation in which Priceline can come forward with affirmative evidence, expert testimony about experiments, et cetera. So that's the reason why that doesn't apply here in terms of burden shifting. What is your view of what happens if we do remand this case, given that you've settled out with Priceline? Well, I believe it's up to the board to decide whether it has an interest in pursuing the case in light of public interest and that sort of thing, Your Honor. Also, the other thing that I'd like to bring up is that, you know, there was some discussion about the specification of the patent and whether it requires, you know, what the definition of federated computing environment is. Before you leave Melnor, I'm sorry. Yes, Your Honor. Do you have some view that if you look at the relevant flow chart with multiple scenarios in it in Melnor that there's something that you can say there must be authentication information in the access card on that particular scenario or it wouldn't work, whatever the it is? Yes, Your Honor. And specifically what it is is the fact that there's undisputed testimony that the user must set up an access card by associating their me card. And that is a but-for condition for the next step in the flow chart. I thought it was the servlet that constructs the access card. But it's the user that associates that servlet-constructed access card with the user's me card. Correct, Your Honor. So the servlet creates the access card and then the user sets it up by associating with the me card. And that is a but-for condition to be logged into the system. That says nothing about what the access card contains. Yes, Your Honor. That particular passage doesn't have anything about what the access card contains. However, because of the other information about the other flows, that tells us what the access card contains. And, in fact, Priceline's only response is that Melnor doesn't tell us one way or another whether access cards contain credentials. But because if you think about it, you end up being logged into the system and it's called an access card. And we have expert testimony saying that's the only way someone of skill in the art would interpret the reference. And the fact that the reference should be interpreted in light of what someone of skill in the art would interpret it as. And there's no response from Priceline on the other side. All of that tells us for sure that access cards have credentials. And the response is literally just silence. And that's not enough. Okay. I thank both counsel for their arguments. The case has taken their submission. Thank you.